UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EPIPHANY LAZARUS KING LAZARRE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | | |
| v. | | Civil Action No. 18-cv-12260-DJC |
| MASSACHUSETTS DEPARTMENT OF CORRECTION, et al., | | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                              **January 9, 2024**

**I.      Introduction**

Plaintiff Epiphany Lazarus King Lazarre ("Lazarre") filed this lawsuit against multiple Defendants affiliated with the Massachusetts Department of Correction ("DOC") and Defendants who provided medical treatment to him while he was incarcerated at Old Colony Correctional Center ("OCCC").  D. 1, 67.  After this Court ruled on the motions to dismiss the second amended complaint, D. 71, D. 78, the following claims survived:  discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* as to the DOC for equitable relief (Count I);  retaliation in violation Title V of the ADA, 42 U.S.C. § 12203 *et seq.* for equitable relief as to Defendants Emily Holmes ("Holmes"), John Straus ("Straus"), Suzanne Thibault ("Thibault"), Michael Amaral ("Amaral"), Aaron Beausoleil ("Beausoleil"), Michael Cunha ("Cunha") and Peter Pascucci ("Pascucci") in their individual capacities (Counts II and III); the Eighth Amendment claim under 42 U.S.C. § 1983 as to Holmes, Straus, Thibault, Amaral, Beausoleil, Cunha, and Pascucci and Dr. Adriana Carrillo ("Carrillo") in their individual capacities

1

(Counts V, VI, III) and the claim for non-monetary relief for violation of the Eighth Amendment under 42 U.S.C. § 1983 as to Defendants Carol A. Mici ("Mici"), Stephen Kennedy ("Kennedy") in their official capacities (Count IV). D. 89. All Defendants, except Mici and Kennedy, have moved for summary judgment. D. 148; D. 151; D. 157. For the reasons stated below, the Court ALLOWS Holmes and Straus's motion for summary judgment, D. 148, and ALLOWS Carrillo's motion for summary judgment, D. 151.[1]

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 322–23 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. See Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

---

[1] At the request of the parties, the Court holds in abeyance the motion of the DOC, Thibault, Amaral, Beausoleil, Cunha and Pascucci's (the "DOC Defendants") motion for summary judgment, D. 157, pending finalization of the terms of their settlement agreement and the filing of a stipulation of dismissal. D. 169; D. 177; 178.

### III. Factual Background

The Court draws the following facts from the parties' statements of undisputed facts, responses to the same and accompanying exhibits. D. 150; D. 154; 159; D. 162–68. Such facts are undisputed unless otherwise noted.[2]

#### A. Lazarre's Ongoing Back Pain

Lazarre was an inmate at the Suffolk County Jail at Nashua Street from January 2013 to November 2014, and an inmate at OCCC between November 2014 and 2022. D. 162 at 2 ¶¶ 1, 2; D. 163 at 1 ¶ 1. Prior to his incarceration, Lazarre suffered spinal injuries in an automobile accident, which caused him ongoing back pain. D. 162 at 2–3 ¶ 3; D. 163 at 2 ¶ 2. In 2014, Lazarre received treatment for back pain from orthopedic specialists at Boston Medical Center, including steroid injections. D. 162 at 3–6 ¶¶ 4–11; D. 163 at 2 ¶ 3.

When Lazarre arrived at OCCC, he walked with a limp and carried a cane. D. 164 at 15 ¶ 1; D. 168 at 2 ¶ 1. At OCCC, Lazarre received medical treatment from DOC's third-party contractors, including Wellpath. D. 164 at 3 ¶ 4; see D. 162 at 6 ¶ 12. Defendant Holmes was a Wellpath Health Services Administrator at OCCC from 2015 to 2020. D. 162 at 6–7 ¶¶ 12–14. Prior to September 2017, medical providers who treated Lazarre concluded that he could walk comfortably with a rolling walker and did not need a wheelchair while in OCCC. D. 164 at 6–7 ¶ 9. Due to his ongoing back pain, Lazarre also received accommodations such as a bottom bunk and stair pass. D. 168 at 2 ¶ 6.

---

[2] There are instances where Lazarre disputed aspects of a statement of undisputed fact, but not other aspects of that statement. As to the latter, the Court accepts those as undisputed.

### B. Administration of Steroid Injections by Carrillo

On August 16, 2017, Lazarre was diagnosed with lumbar radiculopathy. D. 163 at 6 ¶ 1; D. 168 at 2 ¶ 3. On September 21, 2017, Carrillo administered two steroid injections to Lazarre at Lemuel Shattuck Hospital. D. 163 at 2–3 ¶¶ 5, 7. Carrillo discussed potential complications with Lazarre including the potential for paralysis and the chance that the treatment would be unsuccessful. Id. at 2 ¶ 6. Immediately after the injections, Lazarre experienced numbness and was unable to walk. Id. at 3 ¶ 8. Carrillo arranged for Lazarre to return to OCCC in a wheelchair and recommended that Lazarre use a cane in the near term. Id. at 3 ¶ 8. She also provided Lazarre discharge instructions stating that he was to follow-up with a telemedicine visit one month later and instructing him to contact prison authorities to facilitate his follow-up appointment. Id. at 3–4 ¶¶ 9–10. Lazarre never had a follow-up appointment with Carrillo. Id. at 4 ¶ 13.

Within days of receiving the steroid injections, Lazarre complained of severe back pain. D. 162 at 11 ¶ 21; D. 168 at 2 ¶ 4. He stated that he did "not want to return" to Lemuel Shattuck Hospital because the injections made his pain worse and he did not want further injections. D. 162 at 11 ¶ 21; see D. 150-6. On September 29, 2017, Holmes approved accommodations for Lazarre including "no work status," "no jogging/sports," "no weightlifting," "bottom bunk," "handicap shower," "walker rolling," "elevator pass" and "cane until walker arrives." D. 163 at 8 ¶¶ 24–25; D. 168 at 2 ¶ 5. In October 2017, OCCC medical staff transferred Lazarre to Souza-Baranowski Correctional Center ("SBCC") for infirmary level care and physical therapy. D. 163 at 9 ¶ 29; D. 168 at 2 ¶¶ 9–10. Lazarre reported excruciating pain, incontinence, difficulty standing and walking and numbness and cramping. D. 164 at 16-17 ¶¶ 11-13; D. 168 at 3 ¶¶ 11–13. Lazarre received treatment from Dr. Patricia Ruze ("Ruze"), who spoke with Carrillo. D. 163 at 11 ¶¶ 47, 50; see D. 163 at 12 ¶ 55. Ruze and Carrillo agreed that a spinal MRI and neurosurgical consultation at Boston Medical Center would be appropriate. D. 166-18 at 2. An MRI taken on November 3,

2017 showed that his lumbar and cervical spine were normal but for "mild/minimal disc bulging." D. 162 at 11 ¶ 22. In December 2017, Holmes authorized a wheelchair for Lazarre to use for offsite transportation. D. 162 at 24 ¶ 15; D. 168 at 3 ¶ 15.

### C. Lazarre's Post-Injection Accommodation Requests and Grievances

On February 13, 2018, Lazarre submitted a grievance that he had still not received a neurology appointment, which Holmes ultimately denied, stating that "there is no clinical indication for a follow-up appt. at BMC following your MRI of the lumbar spine on 11/3/17 as surgery was not recommended." D. 165-23 at 2; D. 162 at 24 ¶ 16; D. 168 at 3 ¶ 16. Around the same time, Holmes's supervisor expressed a preference that Holmes should not be involved in responding to a grievance by Lazarre about Holmes. D. 165-25 at 7; see D. 162 at 24 ¶ 17; D. 168 at 3 ¶ 17.

On March 29, 2018, Holmes wrote to her supervisor in an email, "I would like to discuss restricting Mr. Lazarre's grievances – he continues to file weekly complaints on issues that have already been addressed and I feel he is abusing the grievance process." D. 165-35 at 2. During the spring and summer of 2018, Holmes responded to multiple grievances submitted by Lazarre, including two denials of grievances for a wheelchair in April and August of 2018. D. 162 at 25-26 ¶¶ 18-19, 21, 23, 24-25; D. 168 at 3–4 ¶¶ 18–19, 21, 23, 24–25.

On August 7, 2018, Lazarre was examined for the first time by Straus, a medical doctor employed by Wellpath, who provided primary care to inmates at OCCC. D. 162 at 7 ¶ 15; id. at 12 ¶ 24. Straus ordered Lazarre a "wheelchair with pusher for distance out of unit for chow, classes, etc." D. 150-11 at 7; see D. 162 at 12 ¶ 26. At the time of this examination, Holmes was on vacation. D. 162 at 27 ¶¶ 30-31; D. 168 at 5 ¶¶ 30–31. When Holmes returned from vacation, Straus discussed the wheelchair order with Holmes (and others on staff). D. 162 at 13 ¶ 31; D. 168 at 5 ¶ 31; D. 150-11 at 9.

5

On August 24, 2018, Straus rescinded the wheelchair accommodation. D. 162 at 12–13 ¶ 28; D. 168 at 5 ¶ 28. In his progress notes, Straus wrote: "Informed will not be able to accommodate [follow-up wheel chair request]. Must continue seated walker as no objective evid[ence] of need for further accommodation." D. 150-11 at 9. Straus's August 24, 2018 note further indicates that a nerve conduction test was negative and MRIs of his L-5 spine were "without significant stenosis." Id. at 9; D. 162 at 13 ¶ 29. Finally, Straus noted that "Correction states [video] when patient unaware of filming shows patient able to move with relative ease." D. 150-11 at 9; D. 162 at 12-13 ¶ 28. At his deposition, Straus testified that he learned of this video in a discussion with Holmes, although he never saw the video himself. D. 150-2 at 10.[3]

Between 2018 and 2019, Lazarre filed at least thirty grievance forms. D. 162 at 15 ¶ 34. Certain requests for accommodations were allowed, including a pocket talker to address reported hearing loss, back and hand braces, a first-floor handicapped cell, and a rolling walker with a seat. Id. at 17–21 ¶¶ 40, 42–51, 53–54. On November 19, 2019, Straus approved Lazarre for a wheelchair for offsite transport and for access to the handicapped showers. D. 162 at 21 ¶ 56. Lazarre was not approved for use of a wheelchair within OCCC. See id. at 17 ¶ 41; D. 162 at 25-26 ¶¶ 19, 25; D. 168 at 4-5 ¶¶ 19, 25.

IV.   **Procedural History**

Lazarre instituted this action on October 25, 2018, D. 1, and filed the operative, second amended complaint on June 15, 2020. D. 67. All defendants except Mici and Kennedy moved for summary judgment, D. 148; D. 151; D. 157. The Court heard the parties on the pending motions

---

[3] Lazarre disputes that DOC staff observed him moving without issue on video, D. 162 at 10 ¶ 19, and argues that Straus lacked personal knowledge to support his deposition testimony because he never viewed the video himself. Id. The Court accepts Straus's undisputed testimony that he based his decision to rescind the wheelchair order in part on his belief that DOC staff had observed Lazarre walking with relative ease on camera. D. 150-2 at 12–13; D. 162 at 12–13 ¶ 28.

and took these matters under advisement. D. 174. As previously noted, the Court now addresses the motions filed by Holmes and Straus, D. 148, and Carrillo, D. 151.

V. Discussion

    A. **ADA Retaliation (Count II against Holmes and Straus)**

To establish a *prima facie* retaliation claim against Straus and Holmes under Title V of the ADA, Lazarre "must present evidence that: (1) he engaged in conduct protected by the ADA, such as complaining about a lack of a reasonable accommodation; (2) the defendants subjected him to some adverse action; and (3) there was a causal connection between the protected conduct and the adverse action." Snell v. Neville, 998 F.3d 474, 487 (1st Cir. 2021) (citing D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012)). If Lazarre establishes a *prima facie* case, the burden shifts to Defendants "to provide a 'legitimate non-retaliatory explanation for the adverse action.'" Id. (quoting Esposito, 675 F.3d at 42). The burden then shifts back to Lazarre "to establish sufficient facts such that a reasonable juror could believe the defendants' explanations were pretextual, meaning the defendants were 'motivated by a retaliatory animus.'" Id. (quoting Esposito, 675 F.3d at 42).

As to the first element, the record establishes that Lazarre engaged in protected activity by filing grievances against prison officials regarding medical care and accommodations for his disability. D. 162 at 13 ¶ 29; id. at 15 ¶ 34; id. at 17 ¶ 41; see Snell, 998 F.3d at 488 (concluding that "numerous grievances concerning losing access to the first floor [law library] can reasonably be viewed as protected conduct"); Feeney v. Mici, No. 20-cv-10425-PBS, 2022 WL 20439023, at *11 (D. Mass. Sept. 2, 2022) (concluding that inmate engaged in protected activity by "fil[ing] numerous grievances, Requests for Accommodation and letters in which he complained about the defendants' failure to accommodate his medical disabilities"). To the extent that Holmes and Straus suggest that Lazarre did not engage in protected conduct, see D. 149 at 11 (noting that

7

Lazarre "has not provided any ADA forms indicating he requested an ADA accommodation), the Court rejects it, particularly given the undisputed evidence that an inmate could seek a reasonable accommodation in various ways. See D. 164 at 9 ¶ 14 (explaining that inmate could request reasonable accommodation by verbal or written request to DOC staff or medical/mental health or by "completion of the Request for Reasonable Accommodation form").

Nevertheless, to prevail on his claim, Lazarre must still show that Holmes and Straus took adverse action against him and there was a causal connection between such adverse action and Lazarre's protected conduct. "[A]ny decision 'causing a significant change in benefits' may constitute an adverse action for the purposes of a retaliation claim." Knox v. Mass. Dep't of Corr., No. CV 14-12457-LTS, 2017 WL 3401443, at *13 (D. Mass. Aug. 8, 2017) (quoting Pierce v. District of Columbia, 128 F. Supp. 3d 250, 282 (D.D.C. 2015)); see Snell, 998 F.3d at 487 (explaining that "[a]n adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination" (internal citation omitted)). "[A]dverse actions in the prison context include a change in work assignment that affects wages, benefits, and good time credit . . . and transfer to a higher security prison." Knox, 2017 WL 3401443, at *13 (internal citations omitted).

Lazarre alleged that "around May 2018" Holmes "ridiculed Mr. Lazarre and threatened him with adverse consequences in response to his repeated requests for accommodations." D. 67 ¶ 99. Lazarre, however, does not provide any specific facts as to "the context in which it arose" or indeed even what was said. See Snell, 998 F.3d at 491 (concluding that inmate had made only "bald, conclusory allegation insufficient to create a genuine issue of material fact" where he did not describe when, where and in what context conversation with ADA coordinator occurred); Wilson v. Fairhaven, No. 18-cv-11099-PBS, 2021 WL 1387778, at *2 (D. Mass. Mar. 8, 2021)

8

(quoting Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016)) (explaining that "'unsupported, speculative assertions,' and conclusory statements . . . in a verified complaint serving as the equivalent of an affidavit do not create a genuine or a material fact sufficient to warrant proceeding to trial"). Moreover, Lazarre offers no evidence that Holmes's ridicule and threats caused him any significant change in benefits or otherwise adversely affected his status at OCCC. Nor was Lazarre reasonably or actually dissuaded from continuing to file grievances throughout the remainder of 2018 and 2019. See D. 162 at 15 ¶ 34; see Knox, 2017 WL 3401443, at *14 (concluding that "reclassification hearing" was no adverse action where prisoner's housing was not actually changed a result and prisoner had not adduced evidence of harm caused by the hearing itself).

Lazarre's only other evidence of an adverse action are comments Holmes made to her supervisor expressing a desire to limit Lazarre's ability to file grievances (because he had been filing weekly complaints "that have already been addressed"). D. 165-35 at 2; D. 165-36. No evidence identified by any party suggests that Lazarre's access to the grievance process was in fact restricted. See Gladu v. Correct Care Sols., No. 2:15-cv-00384-JAW, 2017 WL 6454016, at *12 (D. Me. Dec. 18, 2017) (concluding that "write-up" did not "result in materially adverse consequence" where disciplinary proceeding against inmate was dismissed), report and recommendation adopted, 2018 WL 881759 (D. Me. Feb. 14, 2018), aff'd, No. 18-1167, 2019 WL 10982435 (1st Cir. Aug. 30, 2019).

To the extent that Lazarre argues that the adverse action by Straus and Holmes was the denial of some of his requests (e.g., use of a wheelchair onsite), the undisputed record does not show that even assuming that the failure to provide one request (where other such accommodations were provided) was an adverse action, there has been no showing that there was a causal

connection between the protected conduct and the adverse action. Here, the wheelchair request was ultimately rescinded and denied by Straus based on information, including but not limited to information from staff, bearing upon the lack of medical necessity.

For all of these reasons, Lazarre has failed to show that there is a disputed issue of fact warranting denial of summary judgment for Straus and Holmes on this retaliation claim. See Snell, 998 F.3d at 488. Accordingly, the Court ALLOWS Straus and Holmes's motion for summary judgment as to the ADA retaliation claim (Count II).[4]

### B. Eighth Amendment

"Although the Eighth Amendment does not mandate comfortable prisons, it does not permit inhumane ones either." Abernathy v. Anderson, 984 F.3d 1, 6 (1st Cir. 2020) (internal quotation marks and citation omitted). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment," Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation omitted). To make out such a claim, a plaintiff must satisfy both an objective and subjective injury. Snell, 998 F.3d at 494–95.

First, as an objective matter, the plaintiff must establish that he had a "'serious medical need[]' for which the defendants provided inadequate care." Snell, 998 F.3d at 495 (alteration in original) (quoting Estelle, 429 U.S. at 104). "A medical need is sufficiently serious if it 'has been diagnosed by a physician as mandating treatment,' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 27 (1st Cir. 2023) (quoting Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018)). This inquiry is directed towards "the particular risk of harm faced by a prisoner due to the challenged

---

[4] Given this conclusion, the Court thus need not reach Holmes and Straus's alternative argument that there is no individual liability for a retaliation claim under 42 U.S.C. § 12203 as opposed to claims under other titles of the ADA. D. 149 at 6-7; 168 at 10.

deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." Abernathy, 984 F.3d at 7 (citation omitted). The Eighth Amendment does not require prison administrators to provide "care that is ideal, or of the [plaintiff]'s choosing," but "[r]ather, the Constitution proscribes care that is 'so inadequate as to shock the conscience.'" Kosilek v. Spencer, 774 F.3d 63, 82–83 (1st Cir. 2014) (citations omitted). Second, the plaintiff must establish that "prison administrators also exhibit[ed] deliberate indifference to the [plaintiff's] need." Id. at 83. Deliberate indifference is "more than negligence . . . yet it need not be intentional harm." Snell, 998 F.3d at 497 (citation omitted). "The defendants must have known of the risk of harm to the plaintiff and disregarded it." Id. (citation omitted).

Lazarre has asserted Eighth Amendment claims against Holmes, Straus and Carrillo, all of whom have moved for summary judgment on this claim. D. 67; D. 148; D. 151.

    1.  *Holmes and Straus (Counts V and VII)*

As to Defendants Holmes and Straus, Lazarre argues that the denial of a wheelchair and failure to refer him to a specialist constitutes deliberate indifference to a serious medical need. D. 161 at 18–20. On the record before the Court, it is undisputed that Lazarre suffered from chronic back pain that required some level of treatment and was diagnosed with lumbar radiculopathy and degenerative narrowing at the C2/3 level in his spine. See D. 162 at 22, 25 ¶¶ 3, 20; D. 168 at 2 ¶ 3; id. at 4 ¶ 20 (disputing characterization of Straus's testimony as to Lazarre's treatment plan, but not that radiology report noted degenerative narrowing at C2/3 spine). Lazarre has not, however, shown that the medical treatment Holmes and Straus provided for his condition was so inadequate as to shock the conscience. Kosilek, 774 F.3d at 86. The medical treatment offered "need only be on 'a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (quoting United States v. DeCologero, 821 F.2d 39, 43 (1st Cir.1987)).

While Lazarre need not necessarily offer expert testimony in support of his need for a wheelchair, he has not identified any evidence in the record showing that the Holmes and Straus's refusal to allow him a wheelchair for daily use within OCCC fell below medical standards for adequate treatment. At most, Lazarre points to evidence that some caregivers permitted him to use a wheelchair to and from medical treatment, that Holmes and Straus approved a wheelchair for offsite transportation and to the showers and that one physical therapist queried whether a wheelchair would be appropriate if his condition worsened. D. 162 at 25 ¶ 22; D. 168 at 4 ¶ 22. Although Straus decided initially in August 2018 that a wheelchair with a pusher for use in OCCC would be appropriate, any "disagreement among the experts over the proper course of care does not help" Lazarre. Snell, 998 F.3d at 496. No medical provider concluded that not prescribing a wheelchair for use within OCCC "fell outside of the bounds of acceptable medical practice." See id. (concluding that two doctors' disagreement with treatment plan failed to establish genuine fact dispute as to serious medical need). This is especially so where numerous other accommodations and treatments aimed at addressing Lazarre's mobility and pain were approved. See id. (concluding that doctor's "decision to withhold the no-stairs restriction scales along with the accepted medical touchstones of the time . . . especially considering she also provided [plaintiff] with a range of other therapies to alleviate his pains, including knee sleeves, bottom bunk restrictions, a cane for walking, a back brace" (citation omitted)). Lazarre received steroid injections, physical therapy, diagnostic imaging and other treatment for his condition. D. 162 at 5 ¶¶ 9–11; id. at 11 ¶¶ 20, 22–23; id. at 13 ¶ 29; D. 168 at 2–4 ¶¶ 9, 12, 20; D. 162 at 24 ¶ 15; D. 168 at 3 ¶ 15. Under such circumstances, the Court cannot conclude that the failure to prescribe a wheelchair for use within OCCC is constitutionally inadequate. See Snell, 998 F.3d at 496–97.

As to referral to a specialist, Lazarre has directed the Court's attention to the opinion of Dr. Ruze and Dr. Carrillo that Lazarre should receive an MRI and a neurosurgical consultation when he began experiencing pain after his September 2017 injections. D. 163 at 12 ¶ 55. Although Lazarre argues that refusal to refer an inmate to a specialist can constitute deliberate indifference, cf. Hayes v. Snyder, 546 F.3d 516, 523–25 (7th Cir. 2008) (concluding that fact dispute as to deliberate indifference existed where prison doctor did not refer inmate "with cysts and growths on his testicles, who could not even urinate without extraordinary measures and who repeatedly complained of excruciating and increasing pain" to urology specialist and refused to issue prescription pain medication); Kendall v. Murray, 340 F. Supp. 3d 61, 69 (D. Mass. 2018) (concluding that serious medical need existed where expert opined that standard of medical care required consultation with specialist for mass that persisted for more than a year and which interfered with effective functioning of "rare" medical procedure), he does not explain how the failure to do so in this case resulted in care below the acceptable medical practice. See Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 142–43 (1st Cir. 2014) (granting summary judgment against plaintiff's Eighth Amendment claim where expert "did not conclude that the department had provided inadequate medical care to any inmate" even though he identified certain practices as "substandard"). Indeed, Holmes and Straus point to evidence that the results of the MRI Ruze ordered for Lazarre obviated the need for a neurosurgical consult. D. 150-15 at 4; D. 165-23; see D. 150-11 at 9.

Thus the Court concludes that Lazarre has not established a serious medical need that went unaddressed by Holmes and Straus.

In the interest of completeness, the Court nevertheless evaluates whether Holmes and Straus exhibited deliberate indifference as to Lazarre's condition. Prison officials have a

sufficiently culpable state of mind where they know of a risk of harm and disregard it. Snell, 998 F.3d at 497. There is no dispute on this record that Holmes and Straus were aware of Lazarre's medical condition. However, Lazarre has not adduced evidence that Holmes and Straus simply ignored the risk to him, by denying him a wheelchair or specialist consultation. See id. (concluding that doctor's decision did not amount to deliberate indifference simply because she did not provide plaintiff "with the type of care he desired or . . . he needed"); Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162–63 (1st Cir. 2006) (concluding that no deliberate indifference occurred where plaintiff was examined by medical professionals regularly and received various treatments). Here, Lazarre was examined frequently by Straus and other medical officials and approved for various accommodations. Such a record does not establish deliberate indifference in violation of the Eighth Amendment. See Feeney, 464 F.3d at 162.

The fact that Straus at one point ordered a wheelchair but then rescinded it does not amount to deliberate indifference in light of this record. Id. (concluding that recission of already-issued remedial plan to explore other courses of treatment was not deliberate indifference). Moreover, Straus's decision was not a non-medical opinion simply because it took into account the observations of other staff about Lazarre's functional status. Nor does the fact that Holmes responded to some of Lazarre's grievances naming her demonstrate that she was deliberately indifferent to a risk of substantial harm to Lazarre. D. 168 at 6 ¶ 38. Even assuming that there was a DOC policy against the participation of named employees in responding to a grievance applies to Holmes, Lazarre has not cited any cases where similar conduct established deliberate indifference to an inmate's medical needs, particularly where Holmes approved many of those requests. See Feeney, 2022 WL 20439023, at *15 (concluding that no deliberate indifference

14

occurred where defendants repeatedly responded to inmates' complaints and requested accommodations, even where certain medical equipment was seized or replaced).

Accordingly, the Court grants Holmes and Straus's motion for summary judgment as to the Eighth Amendment claim (Counts V and VII).

### 2. Carrillo (Count VII)

Lazarre asserts that Carrillo's failure to provide him with a follow-up appointment after his September 2017 injections constituted deliberate indifference to his serious medical needs. D. 161 at 21–22. Carrillo argues that there is no evidence in the record of her deliberate indifference.

During Lazarre's September 2017 appointment, Carrillo informed Lazarre of the potential side effects of the procedure and provided him instructions for scheduling a follow-up appointment with her through DOC. D. 163 at 2–4 ¶¶ 6–9, 12. While the record shows that Lazarre submitted a sick call request in November 2017 for a specialist, id. at 12 ¶ 58, neither party identifies any evidence that Carrillo received a request from Lazarre or the DOC for a follow-up appointment. Lazarre argues that Carrillo nevertheless knew that he faced a substantial risk of harm, both because steroid injections generally carry a risk of complications and because of her conversation with Ruze about his post-injection status. D. 161 at 22. According to Lazarre, Carrillo's failure to schedule a follow-up appointment despite this knowledge demonstrated deliberate indifference to his condition. Id. The Court is not persuaded that this conduct rises to the level of "wanton disregard" necessary to state an Eighth Amendment claim. Perry v. Roy, 782 F.3d 73, 79 (1st Cir. 2015). Although Carrillo's conversation with Ruze may have alerted her that Lazarre was reporting symptoms following his treatment, D. 163 at 11–12 ¶¶ 47–57, the fact that the call originated from another medical provider would have indicated that Lazarre was already receiving follow-up care. As noted in Ruze's progress note, Carrillo agreed with Ruze's treatment plan to address his symptoms. D. 163 at 12 ¶ 55; D. 166-18 at 2 (noting Ruze's conversation with Carrillo,

15

that Carrillo "does not feel that adverse consequences of the [injections] would explain any of the current symptoms" and that Carrillo agreed that MRI and neurosurgical consult "would be appropriate").

None of the cases cited by Lazarre stand for the proposition that the conduct of an external specialist, like Carrillo, rises to the level of deliberate indifference given the record here where Carrillo provided medical care and instructions for arranging a followup appointment and provided consultation to the DOC doctor, Ruze, who was addressing the inmate's symptoms after that care. Cf. Perry, 782 F.3d at 79–81 (reversing summary judgment on Eighth Amendment claim where material fact disputes existed as to whether nurses who refused to examine inmate observed that he could not open his mouth and whether facial injuries were sufficiently severe to make layperson aware of need for treatment); Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 498–99 (1st Cir. 2011) (concluding that evidence of deliberate indifference existed where prison doctor knew inmate suffered from HIV, told inmate that he would not provide HIV medications because they were too costly, was admonished by state medical licensing authorities for unprofessional conduct, chose not to review "alarming" diagnostic report and did not refer inmate to a specialist).

Accordingly, the Court grants Carrillo's motion for summary judgment as to the Eighth Amendment claim, Count VII.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS both Carrillo's motion for summary judgment, D. 151, and Straus and Holmes's motion for summary judgment, D. 148.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge